## Smith v. Commonwealth.

(Decided June 11, 1935.)

FLEM D. SAMPSON for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

While Frank Ward was chopping wood near his home on Goose creek in Clay county, about 7 o'clock Saturday morning, September 30, 1933, he was assassinated by a rifle shot from the hillside. Steve Smith appeals from a judgment of life imprisonment and insists that the verdict of guilt of the murder is flagrantly against the evidence.

The deceased and appellant married sisters. Their father, Hence Stewart, lived close to the deceased. A hundred yards or so beyond lived Andrew Smallwood and Elihue Smallwood. The appellant lived in Knox county, about 13 miles away, and there were two mountains between. He owned no mule or horse, and his usual method of travel was afoot. It took six hours to make the journey to the other neighborhood.

Lester Ward, a 16 year old son, testified that he

and Leon Hubbard were on the hillside playing, and that he saw three men, each with a rifle, behind a rail fence, whom he identified as Andrew Smallwood, Gilbert Smith, and the appellant. Steve Smith rested a rifle on the fence and shot his father. He ran to him, thence to inform his stepmother, and on to the home of Andrew Smallwood to get assistance. A little later he went over on Bear creek to get Squire Sizemore to hold an inquest, and did not return until late that afternoon. He says that he told his stepmother the next day about having seen the defendant shoot his father, but admits he told no one else for a long time afterward. It appears he was soon taken by his father's brother into Tennessee and was back and forth between his grandfather's and his stepmother's home. Although he was then staying at the latter place in Clay county, he was not taken before the January grand jury when it was investigating the murder of his father. The appellant was not indicted until April following.

Leon Hubbard did not know his own age. He placed the killing on a Friday, well up in the day. He testified that he and Lester watched the men for 30 minutes, and described in minute detail their dress and actions. With an affirmative ''sure,'' he responded to leading questions of the commonwealth's attorney describing the homicide. During the course of her testimony, the widow said that Leon was about 11 years old.

Ike Hubbard testified that about daylight of the morning of the killing he saw Andrew and Elihue Smallwood, Gilbert Smith (no relation of the defendant), and a fourth man, who wore a cap, at Andrew's home, each with a rifle, and their actions were ''secret'' and suspicious. The witness had known appellant for several years, but did not recognize the fourth man as being him. Lester Ward had testified that there were only three men at the fence, and that appellant was wearing a hat there.

Except the testimony of the widow, who had no knowledge of who committed the crime, this was all the evidence introduced by the commonwealth. She testified that the relations between the parties had always been friendly.

It appears from the evidence of the defense that

appellant's wife had been staying at her father's, Hence Stewart's, for some time before the killing. Appellant had visited there two weeks before and returned about two weeks after the killing. He was there again the following December. There is no contradiction in the proof that there had been no trouble between him and the deceased and that their relations had always been friendly. He established that on Friday he had been working on the barn of his uncle in Knox county and had spent the night there. About the "edge of daylight" he left there and walked across the country to see about a piece of land he was wanting to buy. He detailed his route and named a number of men whom he saw on the way. He had stopped at a grist mill, then where a schoolhouse was going to be sold that day, and went on into the village of Hammond. He got back to his house in the afternoon, fed his chickens and went to his uncle's, where he stayed Saturday night. On Monday he heard about the assassination of his brother-in-law, but did not go over there because he knew Ward would have been buried on Saturday or Sunday. Eight or ten witnesses, including the postmaster and keeper of the mill at Hammond, were introduced and sustained the defendant's alibi. Each of them was clear as to the time because of a rumor spread during the following week that appellant was accused of the murder, and they recalled the day as being that on which the schoolhouse was sold. It would have been impossible for the appellant to have been at the scene of the murder that morning.

It is shown in the record that Andrew Smallwood, Elihue Smallwood, and Gilbert Smith, upon their separate trials, had been convicted of this murder. Elihue was introduced by the defendant. He frankly admitted that on his brother's trial he had testified falsely because, he said, Andrew was his brother and he had to stick by him. He did not testify on his own trial or that of Gilbert Smith. In the meantime, he had been praying over the matter and "something told me to tell the truth." This was before Steve came to jail. He testified how the killing occurred. The cause seems to have been due to Ward's effort to get Andrew Smallwood out of the hollow by means of threatening notices posted on his fence. The sum and substance of his evidence is that Andrew, his older brother, killed Ward.

Andrew had insisted that he should help him, but he had not done so, and had tried to prevent the killing. He was at the home of his mother near by when it occurred. Hence Stewart, the father-in-law of the deceased and appellant, was the stepfather of the witness. He and Andrew helped dig the grave and bury Ward that day. The appellant was not in the neighborhood and had nothing whatever to do with the crime. The witness and defendant had been in jail together and talked about it, but it does not appear that upon the trial of his brother he had stated anything connecting the appellant with the murder. He maintained that he had wanted to testify on Gilbert Smith's trial, but was not called as a witness. After he had testified on this trial, he and his brother Andrew had a fight in the jail.

Elihue's wife corroborated his story in important particulars. She had testified falsely on Andrew's trial because of his threats and her fear. She saw the appellant nowhere around that morning.

In rebuttal, the commonwealth introduced a woman who testified that in the previous spring, "after tater planting time," the appellant had an anonymous notice directing him to move out of the hollow, and he had been told that Frank Ward had written it. He said: "If he knowed it, he would cut his head off with a bullet." Another witness, who had been twice convicted of a felony, related that several months after the killing appellant exhibited some sort of a notice of that character and intimated that he had killed the author of it. This evidence was admitted for the purpose of affecting the defendant's credibility at a witness. It was all denied by him. There is other fragmentary evidence, of more or less relevancy, which is susceptible to a construction adverse to appellant.

It would seem sufficient, without analyzing the evidence or recording our deductions, to express the opinion that, considering the whole of it, the verdict is flagrantly against the evidence, and the trial court should have sustained the motion for a new trial upon that ground.

Judgment reversed.